## Hagar et al. v. Donaldson et al., Appellants.

*Ships and shipping—Ship broker—Commissions.*

Where a ship broker has procured a charter party for shippers, he is entitled to his commissions even though the vessel and the goods are lost by perils of the sea.

*Pleading—Practice—Plaintiff's statement—Setting aside verdict.*

A verdict, after a fair trial, will not be interfered with because of any technical want of accuracy in the manner of stating the claim.

Plaintiffs, ship brokers, sued for a sum equal to the difference between what defendants agreed to pay the vessel owners in the charter party, and what defendants had agreed to pay plaintiffs.   This difference represented their commission as ship brokers, and was so understood by defendants. *Held*, that the claim was sufficiently stated, although it would have been more accurate to have claimed the difference specifically as commissions.

*Freight—Loss of ship and goods.*

Freight is the price to be paid for the actual transportation of goods by sea from one place to another.   The delivery of the goods at the place of destination, according to the charter party, is a condition precedent to entitle the owner to freight.   Hence if any accident befall the ship so that the goods are never delivered no freight is demandable.   Per THAYER, P. J.

Argued Jan. 5, 1893.   Appeal, No. 13, July T., 1892, by defendants, John Donaldson et al., from judgment of C. P. No. 4, Phila. Co., March T., 1890, No. 498, on verdict for plaintiffs, Walter F. Hagar et al.   Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.

Assumpsit to recover commissions as ship brokers.

Plaintiffs by their statement claimed $305 with interest, due under the following circumstances:

" The plaintiffs are ship brokers, doing business in the city of Philadelphia, and the defendants are sellers and shippers of coal and iron, also doing business in the said city, and on or about the first day of October, 1888, the plaintiffs agreed to and with the defendants to furnish for them thirteen hundred and fifty tons of vessel freight or space, twenty-two hundred and forty pounds to the ton, from Philadelphia to Mare Island Navy Yard, California, for the price or sum of twelve dollars per ton, and the said defendants agreed to and with the plaintiffs to pay for the said tonnage or space at the price aforesaid; that subsequently the plaintiffs duly furnished six hundred and ten tons of said capacity upon the bark ' Moro Castle,' and the same was duly accepted by the said defendants, and the said bark was duly loaded and proceeded upon her voyage; that the sum paid by the said defendants to said vessel under the charter party made for the said voyage was eleven dollars and fifty cents per ton, leaving a balance due to the plaintiffs of fifty cents per ton for the six hundred and ten tons; that subsequently, to wit, on or about March 16, 1889, the plaintiffs duly furnished to the defendants the balance of their contract quality of tonnage, to wit, seven hundred and forty tons, upon the ship ' Frederick Billings,' and the same was duly accepted by the said defendants, and the ship duly loaded and departed upon her voyage, and the said plaintiffs say that they performed everything called for by their contract with the said defendants, and that the said defendants, though they have paid for the tonnage upon the said ship ' Frederick Billings,' have failed, neglected and refused to pay the sum of fifty cents per ton for the said six hundred and ten tons, constituting the difference between the contract price of twelve dollars per ton, at which the tonnage was agreed to be furnished, and the sum of eleven dollars and fifty cents per ton actually paid by the defendants for the same."

At the trial the court directed the jury to find for the plaintiffs, subject to the following reserved point:

" Whether the fact of the loss of the vessel and the non-delivery of the cargo is, under the evidence in the cause, a defence to the payment of the plaintiffs' claim of fifty cents per ton on the agreement for affreighting of the ' Moro Castle.' "

The jury found for plaintiffs and assessed the damages at

$346.60. Subsequently defendants moved for judgment in their favor on the reserved point, and for a new trial. The court refused a new trial and entered judgment in favor of plaintiffs on the reserved point, in the following opinion by THAYER, P. J.:

" Freight is the price to be paid for the actual transportation of goods by sea from one place to another. The delivery of the goods at the place of destination, according to the charter party, is a condition precedent to entitle the owner to freight; hence if any accident befalls the ship, so that the goods are never delivered, no freight is demandable. This has been from the remotest times the maritime law of the world. ' Most certain it is,' says Molloy, in his treatise De Jure Maratimo, ' if a ship be cast away the freight vanishes.'

" If, therefore, this were an action by the owners of the ' Moro Castle ' for the recovery of the freight, nothing can be plainer than that the action could not succeed; for the ship having been cast away in the Delaware Breakwater at the very outset of her voyage, and the cargo never having been delivered at Mare Island, her port of destination, the owners could have no claim for freight.

" But this is not a suit by the owners for the freight, but an action by the ship brokers, Hager & Co., for their commissions —the reward to which they are entitled for their services as ship brokers in procuring for the defendants the contract of affreightment of the lost vessel. These services were rendered to the defendants at their request by the plaintiffs, who were not owners, and had no interest in the vessel, but as ship brokers they obtained from the vessel-owners the required space wanted by the defendants for their cargo, and the defendants knew perfectly well when they agreed to pay the brokers for the same at the rate of twelve dollars per ton that they would be subsequently called upon to sign a charter party with the owners, and that the difference between the price per ton put into the charter party for the owners and that put into the agreement with the brokers would represent the commissions of the latter, viz., fifty cents per ton. That was what was sued for in this case, fifty cents per ton on six hundred and ten tons, making $305. However inartificially stated, that was what the controversy was about, and the defendants ought not to be permitted

to escape from their just obligation to the plaintiffs by any lack
of precision in the statement after the merits have been tried,
and the defendants have demonstrated, by their neglect to call
any witnesses, that they have no defense to the plaintiff's claim.
The form of the contract matters little when its purpose, its
essence, and its consideration are so apparent. The character
of the plaintiffs' claim for commissions as ship brokers in pro-
curing the charter party for the defendants from the owners of
the 'Moro Castle,' is not, perhaps, as clearly set forth in the
statement of their claim filed by the plaintiffs as it might have
been. Nevertheless, that was the true character of the claim
presented by the plaintiffs' evidence and tried by the jury;
and the verdict, after a fair trial, ought not now to be inter-
fered with because of any technical want of accuracy in the
manner of stating the claim. The plaintiffs, in their statement,
set forth the facts of the case, and claimed the difference be-
tween the sum agreed upon for freight between the freighter
and the plaintiffs and the sum agreed upon in the charter party
between the freighter and the owners, viz., fifty cents per ton.
The plaintiffs, not being owners, could not have sued for the
freight, even if it had been earned by the delivery of the goods
—that is, the eleven dollars and fifty cents per ton which the
defendants in their charter party had agreed to pay the own-
ers. What they sued for was the difference between what the
defendants agreed to pay the vessel-owners in the charter party
and what the defendants had agreed to pay them, the plaintiffs.
The difference represented their commissions as ship brokers.
It would have been more accurate if they had specifically claimed
this difference as their commissions for having effected the
charter party for the defendants, but it must have been well
known to the defendants that the plaintiffs were ship brokers,
and that their claim of fifty cents per ton represented really
their commissions as ship brokers, and nothing else. Mr.
Thompson, one of the plaintiffs, testified distinctly that he
talked over the matter with the defendants, and that it was
perfectly well understood that the fifty cents per ton which the
plaintiffs were to receive represented their brokerage, and that
the defendants had agreed to pay it, and this testimony was
uncontradicted, the defendants offering no testimony whatever.
Now, although any claim for freight on the part of the owners

was clearly lost by the loss of the ship, no such consequence attached to the claim of the plaintiffs for their just commissions. That was a claim for compensation for a personal service rendered to the defendants by the plaintiffs, which it cannot be pretended was in any way affected by the loss of the ship.

" Judgment for the plaintiffs on the point reserved."

*Error assigned,* inter alia, was entry of judgment for plaintiffs on point reserved, quoting it.

*M. Hampton Todd,* for appellants, cited Richardson v. Young, 38 Pa. 169; Armroyd v. Union Ins. Co., 3 Bin. 437 ; Hurtin v. Union Ins. Co., 1 W. C. C. R. 530 ; Pordage v. Cole, 1 Wms. Saunders, 319 ; Cutter v. Powell, 2 Sm. L. Cas. 25; Rice v. Davis, 136 Pa. 439; Everhart v. Searle, 71 Pa. 256 ; P. R. R. v. Flanigan, 112 Pa. 558.

*John F. Lewis,* for appellee, not heard.

PER CURIAM, January 16, 1893 :

This judgment is affirmed upon the opinion of the learned president of the court below upon the reserved point.